**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,* | |
|                   Plaintiff,        * | |
| vs.                       * | Civil Action No. 10-cv-445-WS-N |
| AMERICAN SAFETY INDEMNITY * | |
| COMPANY and THE MITCHELL   * | |
| COMPANY, INC.,             * | |
|            Defendants.   * | |

## REPLY OF DEFENDANT AMERICAN SAFETY INDEMNITY COMPANY IN SUPPORT OF MOTION TO DISMISS

Defendant, American Safety Indemnity Company ("ASIC"), submits this Reply to the Opposition of Plaintiff, Scottsdale Insurance Company ("Scottsdale"), to ASIC's Motion to Dismiss [Doc.26] ("Opposition"). For the reasons stated in this Reply and in ASIC's previously-filed Memorandum in Support of Motion to Dismiss [Doc.15-1] ("Memorandum"), the Motion to Dismiss is due to be granted.

## I.     SCOTTSDALE FAILS TO ADDRESS *TRAVCO*.

Scottsdale's Opposition is most telling for what it does <u>not</u> address: the opinion of the court in *TRAVCO Ins. Co. v. Ward*,  - - F. Supp. 2d - - , 2010 WL 2222255 (E.D. Va. June 3, 2010).  In *TRAVCO*, the court enforced a pollution exclusion clause to bar coverage for damages allegedly caused by gases released from Chinese drywall. (*See* Memorandum at 15-18.)  "Pollutants" was defined identically in the *TRAVCO* as in the ASIC Policy (the "Policy") issued to Defendant, The Mitchell Company, Inc. ("TMC"), at issue in this case.  In addition, the *TRAVCO* pollution exclusion clause and the Policy's pollution exclusion clauses contain substantially the same operative terms to describe

how the alleged toxic gases were released or escaped from the Chinese drywall and caused plaintiff's damages.  The *TRAVCO* court had no difficulty finding that the compounds released from Chinese drywall are "pollutants" and that the emission of the compounds constituted a "discharge, dispersal, seepage, migration, release or escape" of pollutants, thus bringing the plaintiff's damages caused by the presence of the compounds in plaintiffs' homes within the pollution exclusion clause.  Based on the persuasive authority of *TRAVCO*, this Court should find similarly, and hold that the Policy's pollution exclusion clauses exclude the damages claimed by plaintiffs in the underlying *Little* and *Henderson* suits that allegedly resulted from the presence of the toxic gases released by Chinese drywall in their homes.

## II.   THE HVAC CLAIMS ARE BARRED BY THE POLICY.

Scottsdale's primary argument is that the underlying plaintiffs also claim that they suffered damages due to an improperly "designed and sized HVAC system" and that these HVAC claims are not barred by the Policy's pollution exclusion clauses.  (*See* Opposition at p. 5-7.) This argument fails for several reasons.  Irrespective of the HVAC allegations, the gravamen of the underlying suits is that plaintiffs suffered damages caused by the gases released inside their residences by Chinese drywall; as established previously (*see* Memorandum at 10-18), these claims are barred by the Policy's pollution exclusion clauses.  To the extent the underlying plaintiffs allege any damages resulting *solely* from the allegedly defectively-designed HVAC systems, these damages are barred by the Policy's contractual liability exclusions, its professional liability exclusion, as well as other Policy provisions.

A close and fair reading of the underlying complaints leaves no doubt that most, if not all, of the plaintiffs' damages resulted from the exposure of property or persons to the gases released from the allegedly defective Chinese drywall. While these complaints make alternative and overlapping allegations, it is clear that "but for" the release of the toxic gases from Chinese drywall inside the plaintiffs' homes, these plaintiffs would not have suffered the various damages claimed in their suits. The *Little* Complaint alleges:

> 23. The defective drywall materials emit a combination of sulfide gases which produce a distinctive chemical odor, *and cause corrosion to copper and other metal materials such as those used in HVAC systems, electrical systems, gas fuel systems, and many appliances, electronics, equipment and other items commonly located in residential dwellings*.

> 24. Hydrogen sulfide ("H2S"), one of the gases emitted by the defective Chinese drywall materials, *is a broad spectrum poison which affects multiple systems in the human body*. It can form a complex bond with the body's enzymes which can block the binding properties of oxygen, thereby interfering with respiration.

Compl. [Doc.1], Ex. A at ¶s 23-24 (emphasis added). The *Henderson* Complaint contains the same allegations. *See id*., Ex. B at ¶s 23-24. These allegations show that the gases emitted by the allegedly defective Chinese drywall were the culprits that caused the underlying plaintiffs' damages. As ASIC established in its opening Memorandum, the Chinese-drywall based claims are excluded by the Policy's pollution exclusion clauses.

The allegations in the underlying suits about the HVAC systems focus on the alleged improper design and the "mis-sizing" of these systems. The plaintiffs allege:

> 26. Additionally, defendants manufactured, formulated, *designed*, processed, distributed, delivered, imported, supplied, inspected, tested, marketed, sold, warranted, advertised, used, installed, implied, serviced and/or failed to warn concerning an *inadequate, defective*, and *mis-sized* HVAC system in the plaintiffs' home. As a direct and proximate result of the defective HVAC system, the off-gassing properties of the defective Chinese drywall was exacerbated and worsened. *The defective HVAC*

> *system further directly and proximately caused plaintiff's increased costs*
> *and expenses.*

*Id.,* Ex. A & B at ¶ 26 (emphasis added).  Plaintiffs further allege, more specifically, that defendants provided an "*inadequate, defective, and mis-sized* HVAC system" (*id.* at ¶ 54); that "the HVAC system was *not adequate, properly sized and appropriate* for the plaintiffs' home, and thereby caused damage or exacerbated and worsened the defective drywall condition" (*id.* at ¶ 78); and, that "the HVAC system was *inadequate, mis-sized, and inappropriate* for the plaintiff's homes" (*id* at ¶ 126) (emphasis added).

The only item of the underlying plaintiffs' list of damages that is, arguably, attributable *solely* to the HVAC systems is the allegation that plaintiffs suffered "increased utility and servicing costs".  (*See id.* at ¶ 29(f).)  Plaintiffs allege these damages were directly and proximately caused … by the HVAC system which was improperly…designed...." (*Id.*  at ¶ 30; *see also*, ¶ 26.)  The alleged design shortcoming was the alleged under-sizing of the HVAC system for each home. Assuming, *arguendo*, that the damages based solely on an improperly designed and mis-sized HVAC system are claims for "property damage" that occurred within a time period covered by the Policy, these damages are excluded by either the Policy's contractual liability or professional liability exclusions, as well as by other Policy provisions.

The *Little* and *Henderson* plaintiffs' allegations that they suffered damages from defectively designed or mis-sized HVAC systems are contract-based claims. Stated differently, TMC's (or its subcontractors') alleged failure to provide a properly-designed and appropriately-sized HVAC system was a breach of TMC's contractual obligations, and not a breach of any duty owed in the absence of a contract.   The underlying plaintiffs in fact allege that TMC (or its subcontractors) breached various contractual obligations to

build homes that were habitable and had properly-sized HVAC units.  (*See id.* at ¶ 110-112; *see also*, ¶s 63-71, 72-80, 81-89, 90-98, and 131-134.) The claims based on TMC's providing under-sized HVAC units to the *Little* and *Henderson* plaintiffs - - and, in particular, their claims to have suffered increased utility and servicing costs (the sole claims based on the defective HVAC designs) - - are thus barred by the Policy's contractual liability exclusions.   (Policy, I.A. 2.b. and B. 2.a. (5) and (6).) These exclusions bar bodily injury or property damages that the insured must pay due to assumption of liability in a contract.  *See Baston-Cook Co. v. Aetna Ins. Co.,* 200 Ga. App. 571, 409 S.E. 2d 41, 43 (1991) (claims against a construction manager for property damage due to failure to perform were excluded by a Georgia policy's contractual liability exclusion and "the insurer's duty to defend was not triggered").

In addition, if TMC (or its subcontractors) provided a defectively designed or inadequately sized HVAC system that damaged the underlying plaintiffs, these claims are excluded by the Policy's professional liability exclusion endorsement, which states:

> The following exclusion is added to SECTION I, COVERAGE A. and COVERAGE B., Par. 2. of the policy.

A.  This insurance does not apply to:

> "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any "professional services" by or for the insured.

B.  SECTION V. is amended to add the following definitions:
1.      "Professional services" means:
a.  The preparing, approving, recommending or failing to prepare, approve or recommend maps, drawings, opinions, reports, surveys, change orders, designs, specifications, hazard assessment plans, response actions, abatement methods or products, air monitoring plans or insurance requirements;
b.  Supervisory, inspection, training or engineering services; or

    c.  Commercial or industrial hygiene, air monitoring, testing, laboratory analysis, public health, legal, accounting, architectural, medical, nursing, data processing, consulting or investment advisory services.

Policy, ASIC-ES-98 07 05 04 ("professional liability exclusion").

The underlying plaintiffs allege that the HVAC systems that TMC (or its subcontractors) designed or approved for the underlying plaintiffs' residences were "mis-sized" or did not have adequate capacity. If these allegations are accepted as true, then TMC (or its subcontractors) prepared, recommended, or approved HVAC systems that were too small and inadequate for the underlying plaintiffs' homes. These are "professional services," which the Policy defines very broadly to include: "a. The preparing…or failing to prepare…*designs*, [or] *specifications*…; b. *Supervisory*, *inspection*, training or *engineering services*; or c. Commercial or industrial hygiene, air monitoring, testing, [or]…architectural…services." *Id.* (emphasis added.)  The allegations based on defective HVAC design are thus barred by the Policy's professional liability exclusion. *See, e.g., Batson-Cook*, 409 S.E.2d at 43-44 (1991) (applying Georgia law to hold that a professional services exclusion clause barred coverage where a contractor was sued for breaching its supervisory duties and the clause provided that there would be no coverage for professional services including those which were supervisory in nature); *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.,* 297 Ga.App. 751, 678 S.E. 2d 196, 200 (2009) (relying on *Batson* to bar coverage for claims against construction manager for "failure to properly supervise and manage construction"); *Nationwide Mutual Fire Ins. Co. v. City of Rome*, 269 Ga. App. 320, 601 S.E.2d 810, 812 (2004) (under Georgia law, a professional services exclusion barred coverage for an alleged failure to properly complete a municipality's grant applications).

In short, to the extent plaintiffs in the underlying suits allege damages resulting from emission of toxic gases from defective Chinese drywall, those damages are excluded by the Policy's pollution exclusion clauses; and, to the extent these plaintiffs allege damages from an allegedly improperly designed and mis-sized HVAC system, those damages, if not barred by the pollution exclusion clauses, are barred by either the Policy's contractual liability or professional liability exclusions, or by other provisions.[1]

### III.   SCOTTDALE'S RELIANCE ON *BARRETT* IS MISPLACED.

Scottsdale cites *Barrett v. National Union Fire Ins. Co. of Pittsburgh*, 696 S.E. 2d 326 (Ga. App. 2010), to argue that the Policy's pollution exclusion clauses, which Scottsdale admits are governed by Georgia law, do not bar the claims at issue. Scottsdale's reliance is misplaced, as *Barrett* is distinguishable from the instant facts.

In *Barrett*, the plaintiffs' allegations focused on the negligence on the gas company employees who supervised and directed Barrett's work as a contractor repairing a gas line in a ditch under a tarp.  Barrett essentially claimed that "but for" the negligence of the gas company employees in directing him to work under the tarp where the natural gas accumulated, he would not have been injured. Importantly, for the present analysis:

> [T]he Barretts have not alleged that Barrett was "poisoned" by natural gas or that he was harmed merely by the release of natural gas from the tap. Rather, their complaint asserts that because of the negligence of AGL employees, the natural gas released from the tap was allowed to accumulate, thereby creating an oxygen-deprived atmosphere, and that it was the lack of oxygen that injured Barrett.

---

[1] Other Policy provisions bar the HVAC claims, including:  (a) the Policy's definition of "property damage" (Policy, V. 17.); (b) the business risk exclusions (*id.*, I.A.2.j. (5) & (6)); and (c) the exclusion of damage to impaired property or property not physically injured (*id.*, I.A.2.m.). Regarding applicability of the Policy's business risk exclusions (*id.*, I. A.2.j. (5) & (6)),  under Georgia law, the "business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements…is not covered by the…policy, and the business risk exclusions make this clear." *QBE Ins. Co. v. Couch Pipeline & Grading, Inc.*, 303 Ga.App. 196, 692 S.E. 2d 795, 797-98 (2010) (quoting *SawHorse, Inc. v. Southern Guar. Ins. Co.*, 269 Ga.App. 493, 495-96, 604 S.E. 2d 541 (2004)). As before, ASIC reserves all of its rights and defenses under all Policy terms and exclusions as to all claims.

696 S.E. 2d at 330.  In contrast, under the instant facts, the "but for" event that allegedly caused the damages sustained by the underlying plaintiffs was the release of the toxic gases from the Chinese drywall inside their homes.  There is no allegation in the underlying suits that Scottsdale's insured, TMC, directed the plaintiffs to do anything that caused their damages, as had the insured AGL employees in *Barrett*.

Moreover, *Barrett* is an opinion of the Georgia appellate court, and was not released or affirmed by the Georgia Supreme Court, as was *Reed v. Auto Owners Ins. Co.*, 284 Ga. 286, 667 S.E. 2d 90 (2008), relied upon by ASIC (and discussed in detail at pages 10-13 of the Memorandum).  In *Reed*, the Supreme Court of Georgia found that the escape of carbon monoxide gas inside the plaintiff's rental home was release of a pollutant that was barred by a pollution exclusion clause, which is nearly identical to the pollution exclusion clauses present in the Policy.  In *Barrett*, the court was able to dodge the issue of whether natural gas was a "pollutant" by finding:

> There is nothing in the current record showing that natural gas is generally defined or viewed as an irritant or contaminant.  Indeed, the allegations of the complaint indicate that exposure to natural gas is not necessarily dangerous and does not automatically result in injury so long as the supply of oxygen is not impeded.  In the absence of any such evidence, we have no basis for concluding that natural gas is a pollutant under the terms of the Policy.

*Id.*  Thus, *Barrett,* can hardly be read as contradicting *Reed's* explicit finding that carbon monoxide in a home is a pollutant.[2]

Scottsdale attempts to distinguish *Reed* by arguing that the pollution exclusion clause in *Reed* is not identical to the Policy's pollution exclusion clauses.  However, the definition of "pollutants" is identical in both policies.  In *Reed* and in the Policy,

---

[2] *Barrett's* additional holding (*see* 696 S.E. 2d at 330-331) that Georgia public policy is violated by inclusion of a pollution exclusion clause that excludes coverage for damage caused by natural gas in a policy issued to a company that primarily sells natural gas has no application to the claims at issue in this case.

"[p]ollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste". *Compare Reed*, 284 Ga. at 288, 667 S.E. 2d at 92, to Policy, E*ndors.* ES 98 23 05 04. The Policy's two pollution exclusion clauses differ slightly but both are clearly broad enough to bar the claims at issue. Plaintiffs in the underlying suits allege to have suffered damages from the gases released by the Chinese drywall installed in their homes when TMC built the residences. Thus, plaintiffs in the underlying suits claim damages that fall within the operative language of the Policy's pollution exclusion clauses, in that they allege damages that would not have occurred but for the "discharge, dispersal, release, or escape" of the pollutants (the toxic gases) inside their residences where TMC or its subcontractors installed the drywall during construction operations. Therefore, *Reed* is persuasive authority supporting ASIC's motion to dismiss.[3]

### IV.    ASIC HAS NOT ABANDONED ITS PREVIOUS POSITIONS.

Scottsdale argues in its opposition that ASIC has abandoned its previous positions stated in correspondence denying Scottsdale's claims. (*See* Exhibits C and D to Scottsdale's Complaint.) In its Memorandum, ASIC stated:

> ASIC relies on all provisions of the Policy in support of its motion to dismiss and in defense of Scottsdale's claims. In addition to the Policy terms specifically quoted or referenced in this memorandum, numerous other Policy provisions establish that there is no coverage for the claims and events at issue or that such coverage is excluded.

Memorandum at fn. 1. In addition, ASIC stated:

> In seeking an interpretation of coverage under the Policy, Scottsdale is bound by all of the Policy's terms. In addition, an insurance contract must

---

[3] It is also telling that Scottsdale makes no effort to address the numerous cases cited by ASIC from other jurisdictions applying pollution exclusion clauses to bar damages caused by release of pollutants (gases) within a building or residence. (*See* ASIC's Memorandum at 14-15.)

be construed "as a whole when construing any portion thereof." *Hercules Bumpers, Inc. v. First State Ins. Co.*, 863 F.2d 839, 841 (11th Cir. 1989).

Memorandum at fn. 2. Thus, it is clear that ASIC has reserved all of its defenses and positions based on the Policy's terms, including those stated in ASIC's adjuster's correspondence with Scottsdale.[4] ASIC's correspondence to Scottsdale also reserved all defenses and rights under the Policy, including those on which ASIC based its motion to dismiss.

## CONCLUSION

For the reasons stated in ASIC's initial Memorandum, as well as in this Reply, the Court should enter an order granting ASIC's motion to dismiss and dismissing Scottsdale's claims with prejudice.

Respectfully submitted,

/s/ Joseph P. H. Babington
JOSEPH P. H. BABINTON (BABIJ7938)
Attorney for Defendant American Safety
Indemnity Company

---

[4] The underlying suits have been consolidated with the case styled *Housing Authority of City of Prichard, Alabama v. The Mitchell Company, Inc., et al*, CV-09-901118, in the Circuit Court of Mobile County, Alabama. In that case, TMC filed a third party complaint alleging that "TMC purchased [the subject Chinese drywall] from ACE [Creola Ace Hardware, Inc.] for installation in the Hope VI Properties…" *See* TMC Third Party Complaint, attached as Ex. A. hereto, at ¶6. In Creola Ace Hardware's sworn interrogatory responses filed in the underlying *Henderson* suit, it testified: "defendant [ACE] entered into a contract with Interior and Exterior Building Supply [I&EX] to purchase drywall for sale to The Mitchell Company, Inc. [TMCI] for installation in the Bessemer projects….The purchase of drywall from I&EX for the Bessemer project **began in late 2005 and ended in the fall of 2006**." *See* Responses of Creola Ace Hardware to Interior and Exterior Building Supply's Second Set of Interrogatories, attached as Ex.B. hereto, at ¶2. A logical inference from these documents is that TMC's installation of drywall in the underlying plaintiffs' homes was **completed in 2006 - - nearly two years before the Policy's effective date of September 15, 2008**. In its correspondence attached as Exs. C and D to the Scottsdale complaint, ASIC denied coverage based on, *inter alia*, the fact that the occurrences and damages at issue occurred or **commenced before** the effective date of ASIC's policy and were therefore not covered. These provisions of the Policy provide an alternative reason for granting the motion to dismiss.

OF COUNSEL:

HELMSING, LEACH, HERLONG, NEWMAN
& ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama  36652
Telephone:  251-432-5521
Facsimile:  251-432-0633
Email:  jpb@helmsinglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 2nd of November, 2010, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

M. Warren Butler, Esq.
Starnes Davis Florie LLP
P. O. Box 1548
Mobile, AL  36633-1548
*Counsel for Plaintiff*

Paul C. Wesch, Esq.
Post Office Box 160306
Mobile, AL  36616
*Counsel for The Mitchell Company, Inc.*

**/s/ Joseph P. H. Babington**
Of Counsel

Doc#268773