IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CIVIL ACTION 10-0445-WS-N |
| | ) |
| AMERICAN SAFETY INDEMNITY | ) |
| COMPANY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

ORDER

This matter comes before the Court on defendant American Safety Indemnity Company's Motion to Dismiss (doc. 15). The Motion has been briefed and is now ripe for disposition.

I. **Relevant Background.**[1]

Plaintiff, Scottsdale Insurance Company ("Scottsdale"), brought this action seeking a declaratory judgment against defendants, American Safety Indemnity Company ("American Safety") and The Mitchell Company, Inc ("Mitchell").[2] At its core, this insurance dispute centers on whether a policy issued by American Safety imposes a duty on American Safety to defend and indemnify Mitchell with respect to a pair of Chinese drywall lawsuits filed in the Circuit Court of Mobile County, Alabama, and styled *Diges E. Little, et al. v. The Mitchell Company, Inc., et al.*, and *Robert W. Henderson, et al. v. The Mitchell Company, Inc., et al.*

---

[1] Because this matter comes before the Court on a Rule 12(b)(6) motion, "the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged … in the complaint as true." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009); *see also Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, --- F.3d ----, 2010 WL 4136634, *5 (11th Cir. Oct. 22, 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.").

[2] The Complaint predicates federal subject matter jurisdiction on 28 U.S.C. § 1332, on the strength of allegations that there is complete diversity of citizenship and that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

(collectively, the "Underlying Actions"). While Scottsdale is presently defending Mitchell's interests in the Underlying Actions pursuant to certain insurance policies that Scottsdale issued to Mitchell, Scottsdale maintains that American Safety's policy extends coverage to Mitchell for those actions. In short, then, Scottsdale brought this action to compel American Safety to assume responsibility for Mitchell's defense and liability in the Underlying Actions. Essentially, Scottsdale seeks to pass the *Little/Henderson* reins to American Safety. With that objective in mind, Scottsdale requests a declaratory judgment that American Safety is obligated to defend and indemnify Mitchell against the claims joined in the *Little* and *Henderson* lawsuits. For its part, American Safety denies coverage pursuant to certain policy exclusions.[3]

### A.     *Nature of Underlying Actions.*

The nature and types of claims asserted in the Underlying Actions are of critical importance to an assessment of American Safety's coverage obligations. The latest iterations of the pleadings in both *Little* and *Henderson* are appended to Scottsdale's Complaint as exhibits and are properly considered for purposes of the instant Rule 12(b)(6) Motion. The Fifth Amended Complaint in the *Little* action sets forth the plaintiffs' claims that Mitchell and other entities engaged in conduct pursuant to which "defective, unfit and unsuitable Chinese drywall was installed in the Plaintiffs' homes, and has and continues to injure and damage the Plaintiffs and their property. Moreover, an inadequate, defective and miss-sized [*sic*] HVAC system was installed which exacerbated the drywall condition, and otherwise damaged the Plaintiffs herein." (Doc. 1, Exh. A, ¶ 3.) The *Little* plaintiffs allege that Mitchell "built the Plaintiffs' homes" and/or "acted as the developer" for the subdivision project at issue. (*Id.*, ¶¶ 5, 5-a.)

According to the *Little* plaintiffs, in constructing their homes, Mitchell "distributed, delivered, imported, supplied, inspected, tested, marketed, sold, warranted, advertised, used, installed and/or failed to warn concerning the drywall materials." (*Id.*, ¶ 18.) This is significant,

---

[3]     Although Mitchell (the insured) is nominally a defendant in this action, these insurance issues are being litigated between Scottsdale and American Safety. Mitchell has not filed a brief as to the Rule 12(b)(6) Motion, but has instead remained out of the fray, leaving it to the insurance companies to hash out the coverage issues with respect to the Underlying Actions. To date, Mitchell's participation in this action has consisted primarily of filing a one-sentence Answer (doc. 18) wherein it admits the allegations of Scottsdale's Complaint and consents to entry of a declaratory judgment obligating American Safety to defend and indemnify it in the Underlying Actions. Of course, American Safety strenuously opposes that requested relief.

the *Little* plaintiffs allege, because "[t]he defective drywall materials emit a combination of sulfide gases which produce a distinctive chemical odor, and cause corrosion to copper and other materials such as those used in … items commonly located in residential dwellings." (*Id.*, ¶ 23.) In addition to being corrosive and malodorous, the *Little* plaintiffs continue, the chemical emissions from defective drywall in their Mitchell-built homes may adversely affect "multiple systems in the human body" and trigger an array of health ailments. (*Id.*, ¶¶ 24-25.) The *Little* plaintiffs further allege that Mitchell and other defendants improperly installed "an inadequate, defective and miss-sized [*sic*] HVAC system in the Plaintiff's [*sic*] home," as a result of which "the off-gassing properties of the defective Chinese drywall was [*sic*] exacerbated and worsened. The defective HVAC system further directly and proximately caused Plaintiff's [*sic*] increased costs and expenses." (*Id.*, ¶ 26.) On the basis of these allegations, the *Little* plaintiffs are pursuing a host of state-law causes of action against Mitchell.[4] The parties and this Court agree that the claims and theories of liability presented in the *Henderson* action (*see* doc. 1, Exh. B) are substantially similar (and, indeed, verbatim in many places) to those in *Little* in all respects material to the pending Rule 12(b)(6) motion; therefore, they need not be reproduced in detail here.[5]

       The plaintiffs in the Underlying Actions seek money damages from Mitchell for "[p]ersonal injuries … associated with exposure to the sulfide gases emitted by the defective Chinese drywall," as well as pain and suffering, mental anguish, loss of enjoyment of their homes, increased utility and servicing costs, medical expenses, lost earnings, property damage to household appliances and systems, remedial costs for "tear-out, disposal and reconstruction to correct the defective drywall," property damage caused by the drywall emissions, diminution in home value attributed to Chinese drywall construction, reduced marketability of their homes,

---

[4] Those claims sound in theories of negligence/wantonness; strict products liability; unjust enrichment; breach of implied warranties of habitability, fitness for a particular purpose and merchantability; breach of express warranty; violation of Alabama's Deceptive and Unfair Trade Practices Act; breach of contract; fraudulent misrepresentation; fraudulent concealment/suppression; and failure to secure performance bond.

[5] *See* doc. 15-1, at 3 ("In the Fourth Amended Complaint filed in the *Henderson* action, a different set of plaintiffs make substantially similar allegations to those contained in the *Little* complaint."); doc. 26, at 3 ("The allegations of the *Henderson* plaintiffs are otherwise substantially similar, if not identical to those of the [*Little*] lawsuit ….").

relocation and cleaning expenses, loss of money and time invested in their homes, loss of home equity and loan interest funds, and the like. (Doc. 1, Exh. A, ¶ 29; doc. 1, Exh. B, ¶ 29.) The Underlying Action plaintiffs contend that these damages "were also directly and proximately caused, exacerbated and worsened by the HVAC system …." (Doc. 1, Exh. A, ¶ 30; doc. 1, Exh. B, ¶ 30.)

### B. *The American Safety Policy.*

It is undisputed that American Safety issued a policy of insurance (the "Policy") for the period of September 15, 2008 through September 15, 2009, to which Mitchell was added as a named insured via endorsement. (Doc. 15-2, at 41.)[6] In general, Coverage A of that Policy extends coverage to Mitchell for sums that it "becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (*Id.* at 3.) The Policy provides that American Safety "will have the right and duty to defend the insured against any 'suit' seeking those damages," but indicates that no corresponding duty to defend arises for suits seeking damages to which the Policy does not apply. (*Id.*)[7]

American Safety's Motion to Dismiss turns in large part on the Policy's pollution exclusion endorsement (the "Pollution Exclusion"). By its terms, the Pollution Exclusion excludes coverage for "'Bodily injury' or 'property damage' arising out of the actual, alleged or

---

[6] The Policy was not expressly incorporated in the pleadings in this case; however, Scottsdale's Complaint quoted from it and plainly sought relief predicated on its terms. Given the centrality of the Policy to the Complaint, the Policy's specific terms and exclusions are properly considered for purposes of this Rule 12(b)(6) Motion. *See, e.g., Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleading for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment") (citation omitted).

[7] The Policy also includes a Coverage B for personal and advertising injury liability. Scottsdale's Complaint makes no reference to Coverage B, but instead appears limited to Coverage A. Scottsdale has asserted no arguments in briefing the Rule 12(b)(6) Motion that might reasonably implicate Coverage B. Even if Coverage B is in play, Scottsdale has not maintained that the coverage analysis as to exclusions invoked by American Safety's Motion to Dismiss would differ materially under Coverage B than under Coverage A. Accordingly, this Order will not separately consider or analyze the applicability of Coverage B to the Underlying Actions.

threatened discharge, dispersal, release or escape of pollutants … [a]t or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations … if the pollutants are brought on or to the site or location in connection with such operations."  (Doc. 15-2, at 36, ¶ f.(1)(d)(i).)  That exclusion defines the term "pollutants" as meaning "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  (*Id.* at 36.)

Also potentially relevant to the pending Rule 12(b)(6) Motion is another exclusion (the "Professional Liability Exclusion") providing that coverage does not exist for bodily injury or property damage "arising out of the rendering of or failure to render any 'professional services' by or for the insured."  (Doc. 15-2, at 25.)  The term "professional services" is defined in the Policy as including  (1) "The preparing, approving, recommending or failing to prepare, approve or recommend maps, drawings, opinions, reports, surveys, change orders, designs, hazard assessment plans, response actions, abatement methods or products, air monitoring plans or insurance requirements;" (2) "Supervisory, inspection, training or engineering services;" and (3) "Commercial or industrial hygiene, air monitoring, testing, laboratory analysis, public health, legal, accounting, architectural, medical, nursing, data processing, consulting or investment advisory services."  (*Id.*)

Finally, the Policy includes a choice of law provision specifying that "[t]his policy and all additions to, endorsements to, or modifications of the policy shall be interpreted under the laws of the State of Georgia."  (Doc. 15-2, at 50.)

**II.     Analysis.**

The battleground staked out by the parties with respect to the pending Motion to Dismiss is whether American Safety has a duty to defend Mitchell in the Underlying Lawsuits or whether certain Policy exclusions negate that duty.  American Safety argues that the Pollution Exclusion unambiguously excludes coverage for the drywall-related claims in the Underlying Lawsuits and that the Professional Liability Exclusion excludes coverage for the claims relating to inadequate or mis-sized HVAC units.  On that basis, American Safety contends that Scottsdale's Complaint for declaratory judgment should be dismissed.  However, Scottsdale replies that, while the exclusions in question may ultimately bar coverage from an indemnification standpoint, there is enough doubt as to those exclusions that American Safety must at least furnish Mitchell with a

defense in the Underlying Actions.[8]  The Court therefore focuses the analysis on the particular exclusions invoked by American Safety to ascertain whether that insurer has met its burden of showing that the claims in the Underlying Actions are clearly excluded by the terms of the Policy, so as to relieve American Safety of its duty to defend Mitchell in *Little* and *Henderson*.[9]

### A. *Applicable Legal Principles.*

On its face, the Policy is governed by Georgia law.  "Under Georgia law, insurance companies are generally free to set the terms of their policies as they see fit so long as they do not violate the law or judicially cognizable public policy. … In construing an insurance policy, we begin, as with any contract, with the text of the contract itself."  *Trinity Outdoor, LLC v. Central Mut. Ins. Co.*, 679 S.E.2d 10, 12 (Ga. 2009) (citation omitted).  "An insurance policy is simply a contract, the provisions of which should be construed as any other type of contract." *Those Certain Underwriters at Lloyds London v. DTI Logistics, Inc.*, 686 S.E.2d 333, 336 (Ga. App. 2009) (citation omitted).   In that regard, "words in the policy must be given their usual and common signification and customary meaning."  *Greater Georgia Life Ins. Co. v. Eason*, 665 S.E.2d 725, 728 (Ga. App. 2008) (citation omitted).  "[W]hen the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent. … The proper construction of a contract, and whether the contract is ambiguous, are questions of

---

[8] As Scottsdale puts it, "While Scottsdale agrees that pollution exclusions such as the one in [American Safety]'s policy may ultimately bar coverage for any judgment or other indemnity-related amounts, it does not excuse [American Safety] from its defense obligation under the specific facts of this case and the applicable law."  (Doc. 26, at 2.)

[9] In several places in its brief, Scottsdale balks that American Safety's reliance on the Pollution Exclusion in its Rule 12(b)(6) Motion is a new position that American Safety never took prior to this lawsuit or in coverage denial letters.  (Doc. 26, at 2, 4-5.)  But Scottsdale has not parlayed this general objection into any legal argument pertaining to the Motion to Dismiss.  Specifically, Scottsdale has not contended that American Safety's purported failure to cite the Pollution Exclusion earlier amounts to waiver or estoppel, or that it otherwise bars American Safety from relying on that exclusion as the cornerstone of its Rule 12(b)(6) Motion.  This Court will not consider arguments that the parties have not raised.  Also, any suggestion by Scottsdale that American Safety has waived or abandoned arguments other than the Pollution Exclusion via its Motion to Dismiss is irreconcilable with the plain language of American Safety's principal brief, wherein it reiterates its position that other Policy provisions establish a lack of coverage for the Underlying Actions and that its focus on the Pollution Exclusion for purposes of its Rule 12(b)(6) Motion is not intended as a waiver of other Policy provisions that may defeat coverage. (Doc. 15-1, at 6 n.1 & 12 n.4.)

law for the court to decide." *McGregor v. Columbia Nat'l Ins. Co.*, 680 S.E.2d 559, 564 (Ga. App. 2009) (footnote omitted).

Which state's law applies to the duty to defend obligation is a source of some confusion in the parties' briefs, with American Safety citing Georgia case law, and Scottsdale suggesting (without citations) that "Alabama law may apply to the determination of [American Safety]'s defense obligation and any breach thereof." (Doc. 26, at 5 n.1.) The undersigned need not be sidetracked by this choice of law question, however. Alabama and Georgia law appear substantially similar in material respects as to the duty to defend issue, including the following tenets: (i) an insurer's duty to defend may be broader than its duty to indemnify; (ii) an insurer seeking to avoid its duty to defend bears the burden of showing that the underlying claim is clearly excludable under the terms of the policy; and (iii) in assessing the insurer's duty to defend, any doubts as to coverage must be resolved in the insured's favor. *See, e.g., Elan Pharmaceutical Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998) ("To determine whether an insurer owes its insured a duty to defend a particular lawsuit, Georgia law directs us to compare the allegations of the complaint, as well as the facts supporting those allegations, against the provisions of the insurance contract. … If the claim is only one of potential coverage, however, any doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured.") (citations, internal brackets and quotation marks omitted); *Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F.2d 598, 605 (11th Cir. 1993) ("Alabama holds that an insurer's duty to defend may be broader than its duty to indemnify. … In order to invoke an exclusion in denying a defense, the insurer bears the burden of pointing to allegations of the complaint or other available evidence by which the claim was clearly excludable.").[10] Those principles frame the duty to defend analysis here, irrespective of whether Alabama or Georgia law governs.

---

[10] "The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between [the injured person] and the insured prove a covered accident or occurrence. … If the allegedly injured person's complaint against the insured alleges or the evidence proves not only claims based on a covered accident or occurrence but also claims not based on a covered accident or occurrence, the insurer owes a duty to defend at least the claims based on a covered accident or occurrence." *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1010 (Ala. 2005) (citations omitted); *see also BBL-McCarthy, LLC v. Baldwin Paving Co.*, 646 S.E.2d 682, (Continued)

### B.     *The Underlying Actions and the Pollution Exclusion.*

The linchpin of American Safety's Rule 12(b)(6) Motion is its contention that coverage for the Underlying Actions is unambiguously excluded by the Pollution Exclusion. Both the text of the Pollution Exclusion and the specific claims for relief articulated in the Underlying Actions must be examined in evaluating American Safety's position.

As noted, the claims leveled against Mitchell in the Underlying Actions are premised on the notion that defective drywall found in the plaintiffs' homes is emitting (or "off-gassing") "broad spectrum poisons," to-wit, sulfide gases that produce an unpleasant smell, corrode copper and other materials commonly found in residential dwellings, and may have adverse health effects ranging from respiratory ailments to headaches to nausea to reproductive health concerns. The plaintiffs in the Underlying Actions seek to hold Mitchell liable for this "defective, unfit and unsuitable Chinese drywall" on the theory that Mitchell, as builder of the plaintiffs' homes, delivered, supplied, installed or is otherwise responsible for the presence of that defective drywall. In that regard, the *Little* and *Henderson* plaintiffs seek money damages for personal injuries caused by their exposure to the sulfide gases emitted by the defective drywall, as well as for property damage, including diminution in value and remediation costs for tearing out and replacing that drywall. The gist of the claims in these Underlying Actions, then, is that the drywall Mitchell installed or caused to be installed in the plaintiffs' homes emitted and continues to emit toxic and poisonous fumes/gases injuring them in a variety of ways.

These specific claims must be compared to the contours of the Pollution Exclusion set forth in the American Safety Policy. That exclusion bars coverage for bodily injury or property damage arising out of the "discharge … release or escape of pollutants … [a]t or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations … if the pollutants are brought on or to the site or location in connection with such operations." Scottsdale has not questioned, and cannot reasonably challenge, that the complained-of sulfide gases in the Underlying Actions constitute "pollutants"

---

685 (Ga. App. 2007) ("[T]o excuse the duty to defend the petition must unambiguously exclude coverage under the policy, and thus, the duty to defend exists if the claim potentially comes within the policy. Where the claim is one of potential coverage, doubt as to liability and insurer's duty to defend should be resolved in favor of the insured.") (citation omitted).

for exclusion purposes. After all, the Pollution Exclusion broadly defines "pollutants" as including any gaseous irritants or contaminants, including vapor and fumes. Those sulfide gases are expressly alleged by the *Little* and *Henderson* plaintiffs to be detrimental to human health, to corrode materials found in the homes, and to bear a noxious odor. Plainly, they are alleged to be "pollutants."[11] Nor is there any suggestion by Scottsdale that the Underlying Actions do not involve claims for bodily injury or property damage arising out of the "discharge," "release" or "escape" of those sulfide gases from drywall in the plaintiffs' homes. The *Little* and *Henderson* pleadings repeatedly reference "emission" or "off-gassing" of hydrogen sulfide and other gases from the drywall, which activities fall within the ordinary, common-sense meaning of the terms "discharge," "release" or "escape" of pollutants. Clearly, then, the Underlying Actions claim losses caused by the release of pollutants.

For the Pollutant Exclusion to apply under American Safety's theory, the emissions at issue in the Underlying Actions must be "[a]t or from any site or location on which you or any

---

[11] The common-sense determination that sulfide gases constitute "pollutants," given their alleged irritant qualities, is consistent with the Supreme Court of Georgia's assessment that carbon monoxide gas was a pollutant for purposes of a pollution exclusion that defined "pollutant" similarly to the American Safety Policy. *See Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008) (carbon monoxide gas released inside a house is a "pollutant" for purposes of pollution exclusion, where underlying lawsuit includes allegations that release of carbon monoxide poisoned plaintiff, causing her to suffer difficulty breathing, dizziness, insomnia, nausea, headaches, and other adverse health consequences); *see also TRAVCO Ins. Co. v. Ward*, --- F. Supp.2d ----, 2010 WL 2222255, *18 (E.D. Va. June 3, 2010) ("Although the Drywall itself may not be a pollutant, the gases it releases are. There is no dispute that the Chinese Drywall has released reduced sulfur gases into the Ward Residence. … Under any reasonable definition of these terms, the gases released into the Ward Residence qualify as irritants and contaminants."). In so concluding, the Court recognizes the existence of a strand of authority holding that "pollutants" within the scope of insurance pollution exclusions are confined to what is commonly considered environmental pollution. *See, e.g., Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 800-01 (Ala. 2002) (chronicling an "absolute fragmentation of authority" as to construction of pollution exclusions, and noting divergence in case law about whether particular substances are classified as "irritants" or "contaminants"). But the *Reed* decision leaves no room to challenge that, under Georgia law, pollution exclusions are not restricted to "what is commonly or traditionally considered environmental pollution" where "[n]othing in the text of the pollution exclusion clause supports such a reading." *Reed*, 667 S.E.2d at 92. As such, and in light of Scottsdale's failure to argue otherwise, the Court readily finds that the sulfide gases at issue in *Little* and *Henderson* constitute "pollutants" under the plain language of American Safety's Pollution Exclusion.

contractors or subcontractors working directly or indirectly on your behalf *are performing operations*" and the pollutants must have been "brought on or to the site or location in connection with such operations." (Doc. 15-2, at 36, ¶ f.(1)(d)(i) (emphasis added).) The latter of these requirements is surely satisfied here, inasmuch as Mitchell, its contractors or subcontractors almost certainly brought the pollutant-laden Chinese drywall to the construction site during their operations. But the former requirement, and particularly the highlighted text above, is far more problematic. Again, the Pollution Exclusion applies only to losses arising from the discharge of pollutants from a site where Mitchell or its agents "are performing operations." The language is unequivocally present tense. A reasonable interpretation of the plain words found in subsection f.(1)(d)(i) is that the release of pollutants and the insured's performance of operations must occur contemporaneously for the Pollution Exclusion to apply. After all, the Pollution Exclusion is not worded to bar coverage for losses from pollutant releases at locations where the insured or its contractors "are performing or have previously performed operations," but instead only excludes losses from pollutant releases at locations where the insured or its contractors "are performing operations." That distinction may be critically important here. The Underlying Actions appear to relate, at least in part, to pollutant discharge from Chinese drywall occurring long after Mitchell's operations at the construction site subsided. Indeed, the *Little* and *Henderson* plaintiffs appear to be complaining of ongoing pollutant discharge,[12] but there is no indication and no reason to believe that Mitchell or its contractors "are performing operations" at those locations on an ongoing basis. This temporal disconnect appears on its face to undermine application of the Pollutant Exclusion here.

---

[12] For example, the *Little* and *Henderson* pleadings allege that "[t]he defective drywall materials *emit* a combination of sulfide gases … and *cause* corrosion." (Doc. 1, Exh. A, ¶ 23 (emphasis added); doc. 1, Exh. B, ¶ 23 (emphasis added). They further assert that the defective drywall "has and continues to injure and damage the Plaintiffs and their property." (Doc. 1, Exh. A, ¶ 3; doc. 1, Exh. B, ¶ 3.) These allegations, as well as those plaintiffs' request for tear-out and replacement of the defective drywall and relocation expenses, suggest that they are complaining about ongoing, present pollutant releases, not simply releases that occurred years ago when Mitchell and its subcontractors were actually performing operations at those locations. At any rate, it is certainly not clear from the allegations in the Underlying Actions that the pollutant emissions about which those plaintiffs complain are confined to the timeframe during which Mitchell and its subcontractors were actually performing operations at the residence locations.

Upon careful review of the parties' briefs concerning this aspect of the Pollutant Exclusion, the Court finds that American Safety has not sufficiently addressed this temporal concern.[13] In its principal brief, for example, American Safety largely glosses over this requirement, stating only that the Pollution Exclusion applies to the release of pollutants from the *Little* and *Henderson* plaintiffs' residences, "where [Mitchell] or its subcontractors installed the drywall during their construction operations." (Doc. 15-1, at 13.) And American Safety's reply brief says only that the Underlying Actions involve damages for the discharge of pollutants inside the plaintiffs' residences "where [Mitchell] or its subcontractors installed the drywall during construction operations." (Doc. 29, at 9.) They simply do not address the "are performing operations" prong of the exclusion's requirements.[14]

In short, despite Scottsdale's express objection on this point, American Safety has not demonstrated to the satisfaction of this Court that the Pollution Exclusion unambiguously precludes coverage here. It is, of course, American Safety's burden to prove the applicability of the exclusion, and exclusions are construed narrowly under Georgia law. *See, e.g., Crawford v. Lawyers Title Ins. Corp.*, 675 S.E.2d 232, 233 (Ga. App. 2009) ("[t]he burden is on the insurer to show that a loss or claim comes within an exception to coverage") (citation omitted); *North Metro Directories Pub., LLC v. Cotton States Mut. Ins. Co.*, 631 S.E.2d 726, 730 (Ga. App. 2006) ("We construe insurance policies in favor of the insured and against the insurance company, and exclusions in policies are strictly construed."). These concerns are heightened in the duty to defend context where, as mentioned previously, "any doubt as to … the insurer's duty

---

[13]   Admittedly, the "are performing operations" language of the Pollution Exclusion was not the centerpiece of Scottsdale's opposition brief. But Scottsdale did reference it by highlighting the "are performing operations" language of subsection (d) and questioning whether "the present claim meets all of the requirements of Paragraph (d) of the Pollution Exclusion." (Doc. 26, at 10.) Thus, while it certainly could have developed the point more fully, Scottsdale's brief properly interposed this objection to application of the Pollution Exclusion in this case, and that issue is properly in play for purposes of the pending Motion to Dismiss.

[14]   To be sure, American Safety does persuasively argue that the pollutants were contained in drywall brought to the site in connection with the operations of Mitchell or its subcontractors. But the Pollution Exclusion requires both that the release of pollutants be at a site where the insureds "are performing operations" and that the pollutants be brought to the site in connection with such operations. The second of these requirements may well be satisfied, but substantial doubt remains as to the first.

to defend should be resolved in favor of the insured." *Elan Pharmaceutical*, 144 F.3d at 1375 (applying Georgia law); *see also Stokes Chevrolet*, 990 F.2d at 605 (under Alabama law, "[i]n order to invoke an exclusion in denying a defense, the insurer bears the burden of pointing to allegations of the complaint or other available evidence by which the claim was clearly excludable"). Because the plain language of the Pollution Exclusion limits its reach to pollutant releases at locations where the insured contemporaneously performs operations, rather than pollutant releases at locations where the insured performed operations some years earlier, the Court harbors substantial doubts as the application of that exclusion here. American Safety has not shown that all claims in the Underlying Actions are clearly excludable; therefore, this Court must resolve those doubts as to the duty to defend in favor of the insured.[15]

### III.  Conclusion.

For all of the foregoing reasons, the Court is not convinced that the claims brought against The Mitchell Company, Inc. in the *Little* and *Henderson* lawsuits are clearly excludable pursuant to American Safety's Pollution Exclusion. Those lingering doubts as to coverage preclude American Safety from being released from its duty to defend as a matter of law at this time. Accordingly, American Safety's Motion to Dismiss (doc. 15) is **denied**.[16] American Safety is **ordered** to file an answer to the Complaint on or before **November 23, 2010**.

---

[15]  This conclusion is not undermined by the authorities cited on pages 13 through 17 of American Safety's principal brief because American Safety has not shown that any of them involve pollution exclusions with similar "are performing operations" clauses. This may be a unique feature of the policy at issue in this case. For example, the *TRAVCO* case championed by American Safety involved a pollution exclusion stating that the insurer did not insure for loss caused by discharge, dispersal, seepage, migration, release or escape of pollutants. *See TRAVCO*, 2010 WL 2222255, at *15. The pollution exclusion in *TRAVCO* does not appear limited to the release of pollutants at locations where the insureds "are performing operations"; therefore, *TRAVCO* is distinguishable. More generally, American Safety has not identified any cases in which a similar "are performing operations" restriction on a pollution exclusion has been held to exclude losses caused by the release of pollutants occurring long after the insureds' operations at a site had concluded.

[16]  Two additional points are pertinent. First, the Court need not address the Professional Liability Exclusion because even if American Safety were correct that it bars coverage of HVAC-related claims, the duty to defend would remain in play as to the drywall-related claims. American Safety has not contended that the Professional Liability Exclusion applies to those drywall-related claims. Second, because this case is postured as a Rule 12(b)(6) motion, this Order neither conclusively resolves any coverage issues nor definitively rules out (Continued)

DONE and ORDERED this 10th day of November, 2010.

s/ WILLIAM H. STEELE<br>CHIEF UNITED STATES DISTRICT JUDGE

---

any exclusions under the American Safety Policy. The Court is not holding that the Pollution Exclusion or any other exclusion is inapplicable, nor is it affirmatively ordering American Safety to furnish a defense to Mitchell at this time. Rather, the Court merely finds that movant has not shown that it is entitled to dismissal of this action as a matter of law at this time. Therefore, this action shall proceed into discovery.